COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, O'Brien and Lorish
Argued at Lexington, Virginia


ERIC CLAUNCH, ET AL.
                                                MEMORANDUM OPINION[*] BY
v.        Record No. 0346-24-3                  JUDGE RANDOLPH A. BEALES
                                                        JUNE 24, 2025
BOTETOURT COUNTY
  BOARD OF SUPERVISORS, ET AL.


            FROM THE CIRCUIT COURT OF BOTETOURT COUNTY
                          Edward K. Stein, Judge

            Evan D. Mayo (S. Addison Day; Tremblay & Smith, PLLC, on
            briefs), for appellants.

            Michael W.S. Lockaby, Botetourt County Attorney (Spilman
            Thomas & Battle, PLLC, on brief), for appellee Botetourt County
            Board of Supervisors.

            Robert W. Loftin (John J. Woolard; Juliet B. Clark; McGuireWoods
            LLP, on brief), for appellees Fraley Family Restated Irrevocable
            Dynasty Trust and Rocky Forge Wind, LLC.


        Eric Claunch, David Condon, Melissa Hundley, Michelle Ludwig, Stephen Neas, Joseph

Phelps, Steve Richards, Neil Treger, and Molsie Petty (collectively the "Property Owners")

appeal from the judgment of the Circuit Court of Botetourt County finding that they lacked

standing in the circuit court to challenge the decision of the Botetourt County Board of Zoning

Appeals affirming the determination made by the Botetourt County Zoning Administrator.  The

Property Owners argue that they had standing (1) to request an official determination from the

Botetourt County Zoning Administrator, (2) to appeal that determination of the Botetourt County

Zoning Administrator to the Botetourt County Board of Zoning Appeals, and (3) to file a petition

---

[*] This opinion is not designated for publication.  See Code § 17.1-413(A).

for a writ of certiorari in the Circuit Court of Botetourt County seeking review of the decision of the Botetourt County Board of Zoning Appeals.

## I. BACKGROUND

This matter is part of an ongoing series of lawsuits concerning an onshore wind project known as the Rocky Forge Wind Farm in Botetourt County, Virginia. In March 2017, the Virginia Department of Environmental Quality ("DEQ") granted Rocky Forge Wind, LLC's "Permit By Rule" ("PBR") application authorizing "the construction of a small renewable energy project in Botetourt County." Rocky Forge Wind intends "to construct and operate a wind project located in Northern Botetourt County on the southernmost portion of North Mountain," which is owned by the Fraley Family Restated Irrevocable Dynasty Trust.

In August 2020, Rocky Forge Wind sought modification of the PBR.[1] Several months later, following a public comment period and a public meeting, DEQ determined that Rocky Forge Wind had satisfied the regulatory requirements to construct its planned wind project "provided that Rocky Forge Wind complie[d] with" a set of procedural requirements. These requirements included "removal of all trees in accordance with the requirements of DWR and the United States Fish and Wildlife Service (USFWS) to protect indigenous bat species." DEQ also "strongly encourage[d]" Rocky Forge Wind to use "only plants native to Virginia and adapted to the local site conditions for site restoration, including warm season grasses," to develop a "monitoring and control plan for invasive species," and to "design[] the intervening landscape to minimize its hostility to native wildlife." In July 2021, Apex Clean Energy, Inc., on behalf of

---

[1] As part of its PBR modification application, Rocky Forge Wind committed to construct "[n]o more than 22 turbines with maximum height of 680 feet," to ensure "[w]ind turbine rotor diameters that result in a rotor swept area less than 336,955 m$^2$," and to pursue a "[r]eduction of land for current project design to approximately 120 acres from 200 acres."

Rocky Forge Wind, submitted a site plan that included "the placement of a concrete batch plant" for constructing the foundations of the wind turbines.[2]

Relevant to this appeal, on May 26, 2022, several of the Property Owners—including Eric Claunch, Steve Neas, and Molly Petty, as well as an individual named Jeff Scott and an entity called Virginians for Responsible Energy—submitted a letter to the Botetourt County Zoning Administrator requesting "an official determination as to the legality of locating a concrete batch plant, either temporary or permanent, in a Forest Conservation District." Describing concrete batch plants as "well-known environmental hazards," the letter asserts that "[t]he laydown yard where the batch plant is to be built borders Mill Creek, a designated Class IV wild natural trout stream, and the site plan elevations show that the yard is only a few feet above the flood zone." The letter contends that "dust emitted during the batching process" and "[w]ater used to clean trucks and the batch plant at the end of daily operations" would "wash into Mill Creek" and "poison aquatic life" in the creek. The letter concludes by stating that if the Botetourt County Zoning Administrator determines that "batch plants of any type are not allowed, then any site plan submitted by Apex must be found to be in non-compliance and cannot be approved."

By letter dated July 14, 2022, the Botetourt County Zoning Administrator determined that "a 'concrete batch plant', when operated as a principal or accessory use, would be classified as the use 'concrete mixing, storage plant' by the zoning ordinance and that this use would not be

---

[2] The parties dispute the size and scope of the "concrete batch plant" at issue in this case. The Property Owners characterize the "concrete batch plant" as "a massive concrete production plant built on a *permanent foundation* and requiring multiple air and water emissions permits from the Department of Environmental Quality." (Emphasis in original). They go on to describe it as "a large plant over 50 feet tall that can produce up to 200 cubic yards of concrete per hour," which "is required to provide concrete for the massive foundations demanded by the wind turbine design." Conversely, Rocky Forge Wind describes it as a "temporary concrete batch plant" that would encompass "one specific piece of temporary construction equipment" and be used "onsite during construction of the wind farm."

allowed as either a permitted or special exception use within the Forest Conservation (FC) Use District." However, the Zoning Administrator also determined that "a 'concrete batch plant' is a piece of equipment that would temporarily be allowed within all zoning use districts when located upon the same parcel(s) where approved development has been authorized and that the product produced by the piece of equipment would only be used in association with the approved development." The Zoning Administrator noted that "this letter serves as a Zoning Code interpretation" and that "Section 15.2-2311 of the Code of Virginia, as amended, and Section 25-552 of the Botetourt County Code provides for any party aggrieved by the issuance of this interpretation the opportunity to appeal this decision to the Board of Zoning Appeals within thirty (30) days from the date of this notice."

On August 15, 2022, Melissa Hundley—without any of the other Property Owners—appealed the decision of the Botetourt County Zoning Administrator to the Botetourt County Board of Zoning Appeals. Hundley by counsel argued that she was "aggrieved by the [d]etermination" of the Zoning Administrator because (1) "[s]he owns or occupies land in close proximity to the land on which the CBP [concrete batch plant] is planned for construction, which land is due protection from the noise, glare, smoke, fumes, and odors attendant to industrial uses like the CBP"; (2) "[s]he owns or occupies land with streams which are in close proximity to and connected with Mill Creek, which streams would have their usefulness diminished by pollution and environmental impacts arising from the installation of the CBP"; and (3) "[s]he owns or occupies land which will be devalued by the installation of a CBP in a pristine natural environment and its attendant risks, to include pollution, health impacts, and diminished wildlife activity."[3] She also argued that she "was aggrieved and injured by the [d]etermination because it

---

[3] The Board of Zoning Appeals can only take appeals from "any person aggrieved" by "any decision of the zoning administrator." Code § 15.2-2311(A).

denied her the protection from environmental dangers and conflicting land uses which the Botetourt County Zoning Ordinance (the 'Ordinance') specifically provides County citizens in close proximity or adjacent to the subject parcel in the Forest Conservation District."

On October 11, 2022, following a public comment period and submission of arguments opposing Hundley's position by Rocky Forge Wind and the Fraley Family Restated Irrevocable Dynasty Trust, the Botetourt County Board of Zoning Appeals heard argument on Hundley's appeal of the determination made by the Botetourt County Zoning Administrator. By letter dated October 25, 2022, the Board of Zoning Appeals "unanimously voted to affirm the Zoning Administrator's decision based on testimony presented during the appeal."

On November 10, 2022, Hundley—now joined by the rest of the Property Owners—filed, through counsel, a petition for a writ of certiorari in the Circuit Court of Botetourt County, requesting that the circuit court "declare the BZA's decision void and remand the appeal to the BZA for consideration consistent with the statutory mandate of the Virginia Code and the Botetourt County Ordinance empowering the BZA to review the Zoning Administrator's legal determinations." In the alternative, if the circuit court found "the factual and legal findings of the BZA sufficient to permit appellate review," the Property Owners asked the circuit court to "issue a writ of certiorari to review the decision of the BZA in this matter," to "hold a hearing upon the review of the record returned to it as well as upon such additional testimony and evidence as the Court permits," and to "reverse the BZA's decision in accordance with the arguments and evidence submitted at the hearing."

In their petition, the Property Owners contend that as "landowner[s] living in close proximity to the [s]ubject [p]arcel," they each have standing to appeal the decision of the Botetourt County Board of Zoning Appeals to the circuit court. In particular, Melissa Hundley claims that she "is an aggrieved person" within the meaning of Code § 15.2-2314 because "[h]er

- 5 -

property is adjacent to the [s]ubject [p]arcel" and because her "land will be devalued by the installation of the concrete batch plant." She states that "[t]he 850+ acres and 3 miles of pristine streams that she owns in trust with her siblings were placed in conservation easements through Virginia Outdoors and the Blue Ridge Land Conservancy" and that "[h]er family uses and wishes to preserve the land for outdoor activities like fishing, hiking, trail riding, mountain bike riding, wildflower and mushroom identification and education, birdwatching, and swimming." She notes that she "is in the process of attaining her water quality testing credentials with Trout Unlimited," that she "plans to use the log home on the property as a short-term rental for outdoor enthusiasts," and that she "has also planned farm house rentals, campsites and bow hunting opportunities for visitors." Hundley maintains that "the installation of the concrete batch plant alongside Mill Creek and within 100 feet of the flood zone" will cause "noise, glare, smoke, fumes, and odors" that "will affect local wildlife populations and observation opportunities, which will damage the potential profitability of her business plans, the value of her property, and the use and enjoyment her family and any guests would experience on the land."[4]

Among the other Property Owners, Eric Claunch claims that he "is an aggrieved person" because "[b]right lights at night will impact the dark skies in this region, eliminating or limiting opportunities for star and satellite watching," and because "[h]is recreational use of the James River for canoeing will also be affected by downstream contamination from Mill Creek." Molsie Petty claims that she "is an aggrieved person" because "[h]er property will become less valuable owing to the diminished essential character of the property as a wildlife observation post" and because "[h]er enjoyment of the rivers, tributaries, and streams will be lessened due to the

---

[4] While Hundley owns land adjacent to property on which Rocky Forge Wind plans to construct a wind turbine, and while she is the closest of the Property Owners to the Rocky Forge Wind Farm project, her land is not adjacent to the parcel of land in the Rocky Forge Wind Farm project containing the concrete batch plant at issue in this case. Furthermore, the straight-line distance from her land to the concrete batch plant is approximately two miles.

concrete batch plant's negative effect on water quality, wildlife, and fish in Botetourt County." Stephen Neas claims that he "is an aggrieved person" because "[t]he odors, noise, and pollution from the operation of the batch plant will affect water and air quality for wildlife in the area," and "diminished populations or activity of these fauna will decrease the value of Mr. Neas's home because its essential character is associated with its vibrant wildlife observation opportunities."

In addition, David Condon claims that he "is an aggrieved person" because the "byproduct runoff and washout water," as well as the "odors and emitted sound from the plant," will affect his enjoyment of activities like canoeing, hiking, deer hunting, and fishing "in almost every season." Joseph Phelps claims that he is "an aggrieved person" because "[c]oncrete byproducts and ingredients from the mixing process will make its way into surface water courses, including Mill Creek, and potentially Mr. Phelps' water supply, which is drawn from an underground spring." Michelle Ludwig and Neil Treger claim that they are both "an aggrieved person" because "noise, glare, smoke, fumes, and odors from the concrete batch plant will change migratory bird patterns" and that "runoff byproducts and washout pollution" will limit their "enjoyment of the river for appreciating wildlife and recreation." Finally, Steve Richards claims that he "is an aggrieved person" because "[h]e occasionally sees golden eagles on or around his property and his enjoyment and appreciation of those birds will be diminished by the repelling influence of the batch plant's noise, glare, smoke fumes, and odors."

At the hearing on January 18, 2024, the circuit court judge explained that "the Court is of the opinion that the decision of the zoning administrator in this case was, in the first instance, not something that was appealable to the board of zoning appeals under" *Graydon Manor, LLC v. Board of Supervisors of Loudoun County*, 79 Va. App. 156 (2023). The circuit court judge also said that "even if we get past the issue of—of whether they [the Property Owners] could ask for

- 7 -

the opinion in the first instance," neither "Hundley [n]or any of the other plaintiffs have standing in this particular case." The circuit court judge then concluded, "So basically what the Court is ruling is that there was no standing at any of these levels. That there was no level to ask for the opinion [from the Zoning Administrator], no level then to—no standing to appeal the opinion to the BZA, and then no standing to appeal from the BZA to here."

By final order entered on January 29, 2024, the circuit court held that (1) "Petitioners lack standing to challenge the October 11, 2022 decision of the Botetourt County Board of Zoning Appeals before this Court"; (2) "Melissa Hundley, the sole petitioner before the Botetourt County Board of Zoning Appeals, lacked standing to challenge the decision of the Zoning Administrator before the Botetourt County Board of Zoning Appeals"; and (3) "The Virginians for Responsible Energy, identified as Jeff Scott, Stephen Neas, Eric Claunch, and Molly Petty, lacked standing to request an official determination regarding the concrete batch plant at issue in this case before the Zoning Administrator." The circuit court dismissed the case with prejudice "for lack of standing on part of the Petitioners before this Court, as well as for lack of standing before the Botetourt County Board of Zoning Appeals and the Botetourt County Zoning Administrator." The Property Owners now appeal to this Court.

## II. ANALYSIS[5]

On appeal, the Property Owners argue that the circuit court "erred in holding that all Appellants lacked standing to appeal the October 11, 2022, decision of the Board of Zoning Appeals." The Property Owners contend that the circuit court "improperly confined its

_____

[5] For purposes of this appeal, we will assume without deciding that the Property Owners in this case could request a determination from the Botetourt County Zoning Administrator and that the decision of the Zoning Administrator was an appealable determination to the Botetourt County Board of Zoning Appeals.

aggrievement analysis to the unlawful batch plant and not the larger project the batch plant would be used to construct." They claim this is because

> [a]ggrievement is measured by whether the particularized harms alleged are caused by the challenged decision, and the construction of the wind turbines would be caused by the October 11, 2022, decision of the Board of Zoning Appeals to allow the turbine construction by production of concrete using a concrete batch plant operating in violation of the Botetourt County Zoning Ordinance.

The Property Owners also contend that they "owned or occupied land that was adjacent to the parcel where the concrete batch plant was to be unlawfully constructed and alleged particularized harms sufficient to confer standing under current Virginia precedent, including diminution of their property values arising from the *ultra vires* acts by the zoning administrator."

"We review de novo the question of whether the appellants' factual allegations were sufficient to establish standing, as this issue presents a question of law." *Platt v. Griffith*, 299 Va. 690, 692 (2021). "To establish standing, it is essential for a litigant to 'show an immediate, pecuniary, and substantial interest in the litigation, and not a remote or indirect interest.'" *Id.* (quoting *Westlake Properties, Inc. v. Westlake Pointe Prop. Owners Ass'n., Inc.*, 273 Va. 107, 120 (2007)). *See also Morgan v. Bd. of Supervisors*, 302 Va. 46, 59 (2023) (noting that "the standing doctrine asks only whether the claimant truly has 'a personal stake in the outcome of the controversy'" (quoting *McClary v. Jenkins*, 299 Va. 216, 221-22 (2020))). In challenges of local zoning decisions, we look to two personal-stake factors:

> First, the complainant must own or occupy real property within or in close proximity to the property that is the subject of the land use determination, thus establishing that it has a direct, immediate, pecuniary, and substantial interest in the decision.
>
> Second, the complainant must allege facts demonstrating a particularized harm to some personal or property right, legal or equitable, or imposition of a burden or obligation upon the petitioner different from that suffered by the public generally.

*Morgan*, 302 Va. at 59 (quoting *Anders Larsen Tr. v. Bd. of Supervisors of Fairfax Cnty.*, 301 Va. 116, 121 (2022)).  *See also Friends of the Rappahannock v. Caroline Cnty. Bd. of Supervisors*, 286 Va. 38, 48-49 (2013); *Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. 156, 165 (2022).  Although the Supreme Court has not declared that "off-site dust and noise pollution could never constitute a particularized harm to neighbors in close proximity to an industrial site" or that "a substantial interference with hunting, fishing, and boating activities could never affect neighbors in close proximity to a degree not shared by the public at large," it nevertheless remains the case that "allegations of such harm must be tied to the particular use of the property by the permittee authorized to use it."  *Morgan*, 302 Va. at 61 (citing *Friends of the Rappahannock*, 286 Va. at 49-50).  In other words, a petitioner wishing to establish standing in a local zoning case must allege a "factual background upon which an inference can be drawn that [this] *particular* use of the property would produce such harms and thus impact the complainants."  *Id.* at 60 (alteration in original) (emphasis in original) (quoting *Friends of the Rappahannock*, 286 Va. at 49).

In *Morgan v. Board of Supervisors*, the Supreme Court held that homeowners living across the street from the construction of a Wegmans distribution center did have standing to challenge the project.  *Id.* at 58, 60.  The Supreme Court found that the homeowners had satisfied the particularized harm requirement for standing by sufficiently alleging they would suffer from

> a dramatic increase in traffic to and from the Wegmans facility, including 860 additional tractor-trailer trucks per day traveling through their neighborhood; flooding that will affect one of the homeowner's properties and areas where their children play; chronic, excessive noise from truck back-up alarms; and the localized effect of night-sky light pollution.

*Id.* at 60.  The homeowners in that case had even raised concerns with a "sound study" completed by Hanover County that the homeowners claimed showed that increased noise levels caused by truck back-up alarms violated the local Hanover County noise ordinance.  *Id.* at 61.

- 10 -

The Supreme Court went on to contrast the allegations made by the homeowners in *Morgan* with those made by landowners in an earlier case, *Friends of the Rappahannock*. In that case, local landowners sought to prevent approval of a mining operation because they "claimed that the mining operation would interfere with their hunting, fishing, and boating activities" and would create "dust and noise," as well as a "stagnant pond." *Morgan*, 302 Va. at 60 (citing *Friends of the Rappahannock*, 286 Va. at 42-43). The landowners there were concerned that the mining operation would "end the scenic beauty of the location." *Friends of the Rappahannock*, 286 Va. at 43. Assuming without deciding that the landowners had met the first prong of the standing test, the Supreme Court held that the landowners had not sufficiently alleged that they would suffer a *particularized* harm and had instead "presented conclusory allegations as to possible harms" without a "factual background upon which an inference can be drawn that Black Marsh's [the constructing party's] *particular* use of the property would produce such harms." *Id.* at 49 (emphasis in original).[6]

Guided by these principles articulated by the Supreme Court in *Morgan* and in *Friends of the Rappahannock* in handling the question of standing, we now consider whether the Property Owners here had standing to challenge the decision of the Botetourt County Board of Zoning Appeals in the circuit court.

A. Melissa Hundley's Lack of Standing in the Circuit Court

We first assess whether Melissa Hundley—the closest of the Property Owners to the concrete batch plant site—had standing in the circuit court. The record before this Court on

_____

[6] One of the landowners in *Friends of the Rappahannock* held "a leasehold interest and a right of first refusal in property adjacent to the" site of the mining operation which he used for "duck hunting, fishing, and river access," while another landowner was "the owner of 164 acres of farmland adjacent to the site." *Friends of the Rappahannock*, 286 Va. at 42-43. The other landowners "live[d] directly across the river in King George County, approximately 1,500 feet away from the" site. *Id.*

appeal shows that Hundley, who owns property adjacent to one of the parcels on which Rocky Forge Wind plans to build a wind turbine, does not own land that is actually adjacent to the parcel on which Rocky Forge Wind plans to build the actual concrete batch plant that is at issue in this appeal. Indeed, her property is approximately two miles from the concrete batch plant. Furthermore, Hundley is located much farther from the site at issue here than the landowners in *Friends of the Rappahannock*, who lived next to the mining operation at issue in that case—or the landowners in *Morgan*, who lived across the street from the new Wegmans facility. Hundley is also farther from the concrete batch plant than the petitioners in several other Supreme Court cases assessing standing for litigants who challenged similar zoning actions. *See Historic Alexandria Found. v. City of Alexandria*, 299 Va. 694, 695-99 (2021); *Anders Larsen Tr.*, 301 Va. at 121-22; *Seymour*, 301 Va. at 165-67. Given that the concrete batch plant in this case is not dissimilar from the construction sites at issue in other Supreme Court cases assessing standing to challenge zoning decisions, and given that Hundley is located significantly farther from the concrete batch plant than successful litigants in Supreme Court cases where the Court has found that there was standing, we find that Melissa Hundley has failed to satisfy the first prong of the standing test.

However, even if Hundley did satisfy the first prong of the standing test, she cannot satisfy the second prong of the standing test because she has not shown that the construction and operations of the concrete batch plant create a "particularized harm" to her or to her property that is "different from that suffered by the public generally." *Morgan*, 302 Va. at 60. While Hundley alleges that runoff from the concrete batch plant could damage her streams, the record before this Court on appeal shows that her property is actually *upstream* from the concrete batch plant, so the streams on her property would not be harmed by any purported runoff that runs into Mill Creek.

Furthermore, Hundley's claim that dust and debris from the construction of the concrete batch plant will impact her ability to use her land for "fishing, hiking, trail riding, mountain bike riding," and other similar activities also fails to satisfy the particularized harm requirement. For example, she has not sufficiently alleged why the special environmental protections included in the modified permit that Rocky Forge Wind received from the Virginia Department of Environmental Quality cannot adequately protect her property and her interests from the construction and operation of the concrete batch plant. Unlike the homeowners in *Morgan*, who raised issues with a sound study that had been completed by Hanover County and also gave a specific number of tractor trailers that would be involved in the construction site at issue in that case, Hundley has expressed only a generalized concern that some unspecified amount of dust and debris could impact her opportunities to interact with wildlife and could harm the natural environment for some distance away from the concrete batch plant site. *See Morgan*, 302 Va. at 61. It is not enough for Hundley to claim that dust and noise from the concrete batch plant will affect her. Hundley must instead allege that the dust and noise affect her in a way distinguishable from those around her—the general public—and that the concrete batch plant creates "sufficient noise, particulate matter, or pollution *off site* to cause actual harm." *Friends of the Rappahannock*, 286 Va. at 49 (emphasis in original).

In short, Hundley fails to meet this burden that she has a particularized harm because her claims of reduced wildlife, increased noise, and residual dust are the same claims made by other members of the general public who own property in the area but who live miles farther away from the construction site than she does. She also fails to meet this burden because her specific claims—such as her plan at some point to rent her property to outdoor enthusiasts—are based on unspecified future plans rather than on present facts. Hundley's allegations describing the kind of general harm that a concrete batch plant could perhaps cause her are simply not sufficient to

establish the standing required by the Supreme Court in *Friends of the Rappahannock* (and its progeny) to appeal a decision of the Board of Zoning Appeals to the circuit court. Consequently, we hold that the circuit court here did not err in dismissing this case for lack of standing by Melissa Hundley (the closest party to the concrete batch plant among the Property Owners involved in this litigation).

B. The Other Property Owners' Lack of Standing in the Circuit Court

We next assess whether the other Property Owners had standing in the circuit court.[7] Eric Claunch, David Condon, Michelle Ludwig, Stephen Neas, Joseph Phelps, Steve Richards, Neil Treger, and Molsie Petty each alleged in their petition that the dust, noise, or runoff from the concrete batch plant would negatively impact their enjoyment of the natural resources on their own land and in the surrounding area. These Property Owners, however, like Melissa Hundley, have not alleged why the special environmental protections included in the modified permit that Rocky Forge Wind obtained from DEQ would not protect them from the alleged dust, noise, and runoff from the concrete batch plant.

In addition, the Property Owners have not sufficiently alleged the expected impact of the concrete batch plant on their own properties. Instead, they have merely relied on news reports and other information describing the consequences of other concrete batch plants elsewhere to assert that this concrete batch plant will impact their ability to (among other things) "occasionally see[] golden eagles," to engage in "wildlife observation opportunities," and to use the James River "for canoeing" and for "wildlife and recreation." These general allegations

---

[7] As noted *supra*, the other Property Owners live farther from the concrete batch plant than Hundley—with one Property Owner living nearly 15 miles from the construction site and most of them actually living outside of Botetourt County. Thus, they do not "own or occupy real property within or in close proximity to the" concrete batch plant for purposes of establishing standing. *Anders Larsen Tr.*, 301 Va. at 121 (quoting *Friends of the Rappahannock*, 286 Va. at 48).

- 14 -

stand in stark contrast with the specific allegations in *Morgan*, where the litigants claimed the construction at issue there would "add an estimated 3,165 vehicles per day seeking ingress and egress to the proposed facility," "increase flooding of the Blose property and Totopotomoy Creek where the neighborhood children, including the Blose child and Morgan children[,] often play," and "night sky light pollution" that would affect the litigants more than the general public because "the general public does not live in Plaintiffs['] neighborhood and will not be affected by light pollution caused by this 24/7 Wegmans operation." *Morgan*, 302 Va. at 55-56 (alterations in original). The Property Owners' allegations here are simply too speculative for purposes of establishing standing, and they fail to meet the particularized harm standard because they describe only the *possible* consequences of using a concrete batch plant—not what the *likely* consequences of constructing and operating a concrete batch plant would be to them in this case. *See, e.g.*, *Seymour*, 301 Va. at 168 (explaining that the allegations by the landowners in *Friends of the Rappahannock* were "speculative" because they "asserted that the operation of the sand and gravel mine *may* result in the alleged forms of harm," while the standing test requires a litigant to allege injury or "*potential injury* not shared by the general public" (emphases in original) (quoting *Friends of the Rappahannock*, 286 Va. at 42-43, 49)).

The additional concerns alleged by the Property Owners that a potential "spill of concrete, fuel, cement, etc., could be devastating" to "the property owners abutting Mill Creek" likewise fails to satisfy the particularized harm standard for standing because none of the Property Owners (other than Hundley who, as noted *supra*, lives upstream from the concrete batch plant) claim to own land actually abutting Mill Creek or the Rocky Forge Wind Farm site. Given the limitations already imposed on Rocky Forge Wind by their modified permit from DEQ and given the substantial distance between the concrete batch plant and their own properties, the Property Owners have not really alleged how that noise, dust, and other things caused by the

concrete batch plant are "sufficient" to create "actual harm" to their own properties or interests in a way that is particular to them—and different than how the general public is affected. *Morgan*, 302 Va. at 61. Therefore, under the Supreme Court's caselaw that is binding precedent, we hold that the other Property Owners, like Hundley, simply lack standing to appeal the decision of the Botetourt County Board of Zoning Appeals to the circuit court.[8]

## III. CONCLUSION

In short, the Circuit Court of Botetourt County did not err in holding that the Property Owners in this case did not have the required standing under binding Supreme Court caselaw to appeal the decision of the Botetourt County Board of Zoning Appeals to the circuit court. Melissa Hundley, whose property is located the closest of all the Property Owners in this case to the concrete batch plant site, lives two miles away from the concrete batch plant site, even as the crow flies, and none of the Property Owners have sufficiently alleged how this construction project will have a "particularized harm" on their properties and their interests. Therefore, we hold that the circuit court did not err in finding that the Property Owners did not have standing to appeal the decision of the Board of Zoning Appeals to the Circuit Court of Botetourt County.

*Affirmed.*

---

[8] Because we conclude that the Property Owners did not have standing to appeal the decision of the Board of Zoning Appeals to the circuit court, we need not decide whether the Property Owners could appeal a decision of the Botetourt Zoning Administrator to the Board of Zoning Appeals. *See generally Bon Secours-DePaul Med. Ctr. v. Rogakos-Russell*, ___ Va. ___, ___ (Jan. 2, 2025) (holding a court may assume without deciding on a point to resolve an appeal on the best-and-narrowest ground). *See also Layla H. v. Commonwealth*, 81 Va. App. 116, 140 n.10 (2024) (holding this Court did not "need to reach any additional grounds here because we are deciding this case on the narrowest and best grounds that Plaintiffs simply do not have standing").